Frank A. STRAKE, Plaintiff-Respondent,

v.

R. J. REYNOLDS TOBACCO CO., a corporation, et al.,
Defendants-Appellants.

Nos. 36777, 36778.

Missouri Court of Appeals,
St. Louis District,
Division Three.

July 13, 1976.

Evans & Dixon, Eugene K. Buckley, St. Louis, for defendants-appellants.

Hearnes, Padberg, McSweeney & Slater, Godfrey P. Padberg, St. Louis, for plaintiff-respondent.

KELLY, Judge.

These appeals from a judgment of the Circuit Court of the City of St. Louis awarding the plaintiff-respondent, Frank A. Strake, damages in an amount of $60,-000.00, have their genesis in automobile collisions occurring on February 15, 1973, on

Washington Avenue, just west of its intersection with Pendleton Avenue, in the City of St. Louis. We reverse the judgment as to appellant James Bullock and affirm as to appellants R. J. Reynolds Tobacco Company and Gary L. Thornton.

Respondent and appellant Bullock were operating their respective automobiles eastwardly on Washington Avenue sometime between 9:00 and 9:15 a.m. on the morning of February 15, 1973, with respondent proceeding ahead of Bullock's automobile. There had been a snowfall during the preceding night and at the time of the occurrence in evidence there were patches of ice and snow on Washington Avenue. Washington Avenue is a four-lane street; two lanes for eastbound and two lanes for westbound traffic. Respondent was driving in the inside lane because there was less ice and snow in that traffic lane for eastbound traffic by reason of its use by prior traffic. As he approached the intersection of Pendleton Avenue respondent slowed down and brought his car to a stop to allow a truck on Pendleton Avenue to cross the intersection. In doing so, he pulled slightly into the outside traffic lane on Washington Avenue so that there was sufficient room for other eastbound traffic to pass him without going into the westbound traffic lane on Washington Avenue. According to respondent, after he had his car stopped for a half minute to a minute, he was struck from behind by another motor vehicle driven by Mr. Bullock. Bullock testified that despite the fact he applied his brakes he could not stop his car from sliding and it slid a distance of about one or one and one-half car lengths into the rear of respondent's car.

After the collision between the Bullock car and respondent's car, both drivers exited from their respective motor cars and agreed to separate the two vehicles. Respondent moved his car forward and Bullock backed his car so that when it came to a stop it was approximately three feet from the center line of Washington Avenue, and both cars were straddling the two eastbound traffic lanes. Nevertheless, eastbound traffic continued to pass the two cars

as they sat in the street by going partially into the westbound traffic lanes of Washington Avenue, while respondent and Bullock exchanged information about insurance and other matters. Respondent did not sustain any injury in this first collision.

With the two cars so situated and while the respective drivers were continuing their discussion with respondent standing to the side of his car nearest the center of Washington Avenue and leaning on the trunk of his car as he wrote down the information he was getting from Bullock—5 or 10 minutes after the initial collision—a second collision occurred wherein Mr. Thornton, the operator of the third car involved, ran into the Bullock car pushing it into the respondent's car, knocking respondent away from his car and causing him to sustain the injuries for which damages were sought in this case.

On appeal Bullock contends that the trial court erred 1) in failing to sustain his motion for a directed verdict for the reason that his negligence in colliding with the rear of respondent's automobile was not the proximate cause of the injuries sustained by respondent, or in the alternative, 2) that he is entitled to a new trial on the issues of damages or an order of remittitur (a) by reason of an alleged error in the giving and submitting to the jury MAI 4.01 instruction on damages, and (b) the damages awarded respondent were so excessive as to be the result of mistake or honest error by the jury. Because we hold that the trial court erred in failing to sustain appellant Bullock's motion for a directed verdict at the close of the plaintiff's evidence we reverse the judgment as to appellant Bullock, and we do not reach the merits of the other points he relies on in this appeal.

Paragraph 2 of respondent's Amended Petition—on which the cause came on for trial—alleged that Mr. Bullock "negligently and carelessly drove and operated his automobile in an eastwardly direction on Washington Avenue and into collision with the rear end of plaintiff's vehicle." In Paragraph 5 of this Amended Petition he also pled that the "defendants were negligent and careless in the following respects,"

which, in shortened form were: 1) excessive speed under the circumstances, 2) permitting the front end of their automobiles to collide with the rear end of the automobiles directly in front of them, and 3) failure to keep and maintain a lookout ahead and laterally.

Respondent submitted his case against Mr. Bullock to the jury on the ground that Mr. Bullock was negligent in permitting his automobile to come into collision with the rear of Dr. Strake's automobile and that negligence either directly caused damage to Dr. Strake or combined with the acts of Mr. Thornton to directly cause damage to Dr. Strake. By this submission all other grounds of negligence against Mr. Bullock were abandoned, and on appeal our inquiry is whether respondent proved a submissible case on the charge submitted to the jury. *Guthrie v. City of St. Charles,* 347 Mo. 1175, 152 S.W.2d 91, 95[4, 5] (banc 1941); *Herr v. Ruprecht,* 331 S.W.2d 642, 647[2] (Mo.1960); *Bolhofner v. Jones,* 482 S.W.2d 80, 82 (Mo. App.1972).

The issue becomes whether Mr. Bullock's negligent conduct in permitting his automobile to come into collision with the rear of Dr. Strake's automobile, either alone or combined with the negligence of Mr. Thornton in colliding with the rear of Mr. Bullock's automobile some 5 to 10 minutes after the initial collision between Mr. Bullock's automobile and Dr. Stake's automobile was the proximate cause of Dr. Strake's injuries.

■ The general rule is that a defendant need not be the sole cause of plaintiff's injuries for liability for said injuries to be imposed; liability attaches if his negligence combines with another's to produce the injuries for which damages are sought. *Dulley v. Berkley,* 304 S.W.2d 878, 882[5] (Mo.

1957). Where two or more persons, acting independently are guilty of consecutive acts of negligence which are closely related in point of time, whether they are liable for the injuries sustained by the plaintiff jointly or severally becomes a question of proximate cause. "The proximate cause of an event is that which, in a natural and continuous sequence, unbroken by any new cause, produces the event and without which the event would not have occurred." *King v. Ellis,* 359 S.W.2d 685, 688[2] (Mo.1962). Generally, an efficient, intervening cause is a new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury but it may not consist merely of an act of concurring or contributing negligence. *Dickerson v. St. Louis Public Service Co.,* 365 Mo. 738, 286 S.W.2d 820, 824[3] (Mo. banc 1956), *Penberthy v. Penberthy,* 505 S.W.2d 122, 127[6] (Mo.App.1974). The practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence. *Dickerson v. St. Louis Public Service Co.,* supra, l. c. 824[4]. In deciding whether a plaintiff's injuries were caused by defendant's negligence each case must be decided on its own independent facts and it is seldom that one decision controls another. *Price v. Seidler,* 408 S.W.2d 815, 820[3] (Mo. 1966).

■ Both appellant Bullock and the respondent have cited a number of cases in support of their respective positions on appeal. It would serve no purpose to review each case, its factual situation, and holding here. For those interested in reading those authorities, we have included them in a footnote.[1] The evidence here shows clearly that respondent sustained no personal inju-

---

1. *Branstetter v. Gerdeman,* 364 Mo. 1230, 274 S.W.2d 240 (1955), *Greenwood v. Vanarsdall,* 356 S.W.2d 109 (Mo.App.1962), *Linneman v. Freese,* 362 S.W.2d 585 (Mo.1962), *Duke v. Missouri Pacific Railroad Company,* 303 S.W.2d 613 (Mo.1957), *Brassfield v. Sears,* 421 S.W.2d 321 (Mo.1967), *Knollman v. Kennedy,* 429 S.W.2d 775 (Mo.App.1968), *Cohagen v. Laclede Steel Company,* 317 S.W.2d 452 (Mo.

1958), *Bauer v. Holtkamp,* 389 S.W.2d 850 (Mo. App.1965), *Cluck v. Snodgrass,* 381 S.W.2d 544 (Mo.App.1964), *Leek v. Dillard,* 304 S.W.2d 60 (Mo.App.1957), *Seeley v. Hutchison,* 315 S.W.2d 821 (Mo.1958), *Green v. Kahn,* 391 S.W.2d 269 (Mo.1965), *Terry v. Sweeney,* 420 S.W.2d 368 (Mo.App.1967), and *Goddard v. St. Joseph Light & Power Company,* 379 S.W.2d 565 (Mo.1964).

ries as a direct result of the first collision, and he has made no claim for any property damages sustained by the collision of Mr. Bullock's car with the rear end of his motor vehicle. All of the injuries which are the basis for damages respondent seeks to recover followed the second impact some 5 or 6 minutes after the initial collision and while the drivers of both of those cars were standing in the public street discussing the occurrence of the first collision. For respondent to recover against Mr. Bullock for the injuries he unquestionably sustained in the second collision, it is necessary that he establish that the negligence of Mr. Bullock "concurred" with the negligence of Mr. Thornton *to cause his injuries.*

 We conclude from the evidence in this case that the negligence of Mr. Thornton in colliding with the car of Mr. Bullock and pushing it forward into the car of Dr. Strake causing Dr. Strake to be knocked to the pavement and sustain injury was, as a matter of law an independent intervening act of negligence for which Mr. Bullock was not liable. The distinction between a "concurring" negligent act and an "intervening" negligent act is not always clearly defined. However, the term "intervening" in a case of this type is used in the concept of time and refers to "later events." Here, Mr. Bullock's negligence, permitting his vehicle to come into collision with the rear of Dr. Strake's motor car, had culminated 5 to 10 minutes before Mr. Thornton's car collided with the rear of Mr. Bullock's car. In the intervening 5 to 10 minutes both Mr. Bullock and respondent had time to move their motor vehicles so as to separate them by a distance of approximately six feet, get out of their respective cars again and begin exchanging identification information as respondent stood in the street on the driver's side of his car and leaned on the trunk of his own motor vehicle while writing down the information he was obtaining. Here, where Mr. Thornton should have become aware of the existence of a potential danger created by the negligence of Mr. Bullock and thereafter have avoided colliding with the rear end of the Bullock motor vehicle—an independent act of negligence

—Mr. Bullock is relieved of liability since the condition created by him was merely a circumstance of the accident and not its proximate cause. *Duke v. Missouri Pacific Railroad Company,* 303 S.W.2d 613, 617[4] (Mo.1957). We hold, therefore, that respondent did not make a submissible case against Mr. Bullock and the judgment of the trial court awarding damages against Mr. Bullock is reversed.

Gary L. Thornton, the employee, and R. J. Reynolds Tobacco Company, the employer, present a single point of alleged error for review: that the trial court erred in not sustaining their separate Motions for a New Trial on the ground that the jury verdict was so excessive as to indicate bias, passion and prejudice on the part of the jury or was the result of mistake or honest error in judging the nature and extent of the injuries sustained by the respondent. We find no error and affirm.

 In considering whether a verdict, after the trial court has sustained it, is excessive, an appellate court will consider the evidence which tends most strongly to support the verdict and will disregard evidence to the contrary. *Sanders v. Illinois Central Railroad Co.,* 364 Mo. 1010, 270 S.W.2d 731, 738[9] (banc, 1954), *Shaffer v. Kansas City Transit, Inc.,* 463 S.W.2d 606, 609[2] (Mo.App.1971). In determining whether such judgment is excessive, the appellate court must consider the nature and the extent of the injuries, pain and suffering attendant thereon, and the injured person's disability as affecting his earning capacity, past and future, with due regard for prevailing economic conditions and the current inflationary trend. *Sanders v. Illinois Central Railroad Co.,* supra, l. c. 740[12].

Neither of the appellants offered any evidence in the trial court. The evidence viewed most strongly in support of the jury verdict is that respondent at the time of the occurrence was 71 years of age with a life expectancy of 11.28 years. By profession he was a dentist who was still working full time as a specialist in the field of prosthodontia and implantodontia—i. e. "implant

dentistry." To his knowledge he was the only dentist in the St. Louis area practicing implantodontia. Since 1951 the respondent has been under the care of Dr. Francis Paletta, a plastic surgeon, and has undergone a number of surgical operations for the removal of ulcers on the fingers of his hand which Dr. Paletta attributed to the use of x-rays in the practice of respondent's dental specialties. The first operation occurred in 1951 and involved the thumb of Dr. Strake's right hand. In October of 1965, an ulcer on this hand was removed and a skin graft performed. In 1966 surgery was performed on his maxillary gland, but this did not involve any cancerous tissue. In January, 1972, Dr. Paletta performed an axillary resection on the arm-pit of respondent because the cancer on his finger metastasized and produced a malignant node in the axilla of his right arm. Shortly thereafter some skin grafting was performed and scarring was still present at time of trial. In January of 1973 Dr. Paletta excised a small cancerous lesion from respondent's right arm.

As a result of the occurrence of February 15, 1973, respondent sustained a comminuted fracture of the proximal end of the upper end of the humerus. Although the insertion of a prosthesis consisting of a stainless steel or vitalium ball into upper portion of his arm bone was considered, the history of the cancer was a counterindication and therefore this surgery was never performed. He received conservative treatment from one Doctor, Dr. Mirbaha, consisting of placing his arm in a sling, injection of xylocaine, and was advised to use certain minimal kinds of exercises to loosen up the shoulder. He saw Dr. Mirbaha three to five times.

Dr. Paletta, who was continuing to see respondent because of the cancer, testified that when he saw respondent in March, 1973, x-rays revealed that the ball of the humerus was almost jammed on top of the long portion of the bone which comprises the arm; it was a "bunch of pieces of bone." The humerus was dislodged and comminuted. He described the injury as a "fracture of the arm and shoulder involving the bones that comprise the shoulder joint." He too testified that the course of treatment for respondent was a "conservative-supportive type of treatment," having him place his right arm in a sling and administering pain pills. On October 2, 1973, a nodule which was attached to the axillary vein of respondent's right armpit was excised and on December 18, 1973, he had an "incision of cancer of right arm."

At trial Dr. Paletta testified that respondent's right hand, forearm, arm and shoulder—"all of it together"—has very limited function and respondent could not use it as he did prior to the occurrence of February 15, 1973. Respondent's arm, forearm and hand were swollen and he has to wear an elastic stocking to keep the swelling down when he works. The size of his right arm and forearm is much greater than the size of his other arm because. of the swelling which has become "hardened." This swelling, Dr. Paletta testified, produces pressure on both the blood vessels and the nerves so that circulation is not good and respondent experiences peculiar sensations in the nerves of the fingers. According to Dr. Paletta, respondent has the following residuals from the fracture of his right shoulder which he sustained on the 15th day of February, 1973: 1) a great interference with the motion of the right hand, 2) a swelling of the entire right arm, forearm, and arm, and 3) a great limitation and loss of strength because he has a "frozen shoulder" with limited motion of the right shoulder joint. He further testified that this injury is a painful one and is permanent. He opined that at time of trial respondent had a loss of efficiency of 75% to 80% as a result of these injuries. It is hard for the respondent to work because of his shoulder; he is limited in how far he can reach and is also slower in his work. None of the disabilities experienced by respondent were referable to the surgery occasioned by cancer in his right arm.

Respondent testified that he lost 4 to 6 weeks from his office as a result of this injury. He was required to pay a woman to

answer his telephone calls and refer them to other dentists for a total of $600.00. According to his income tax returns his earnings from his professional practice were as follows:

| 1968 | – | $24,714.73 |
| 1969 | – | 27,077.92 |
| 1970 | – | 28,021.23 |
| 1971 | – | 23,747.23 |
| 1972 | – | 18,290.49 |
| 1973 | – | 14,308.03 |

Some of the reduced income from his practice in 1972 and 1973 was admittedly the result of time lost due to surgery performed on him for the cancerous condition of his right arm. He missed ten days to two weeks from his practice in 1973 due to the cancer and the surgical procedures it required. He further testified that since the automobile collision his injuries have affected his practice because he cannot see as many patients as he could prior thereto and he works longer hours to achieve the same amount of work. He now works at only 75% to 80% of his efficiency because of his injuries.

At the time of trial respondent's evidence was that he has sustained a 65% to 70% permanent loss of the use of his right arm at the shoulder. He cannot lift anything with his right hand because he has no strength in it nor in his right arm. He cannot perform many of the daily personal functions requiring the use of his right hand, e. g. combing his hair, dressing and undressing, shaving, carrying packages, etc. He cannot play golf. If he wants to lift his right hand he must raise it with his left hand. At trial he was asked to raise his right arm and he did so. The jury was able to observe this. In addition to the injuries to his right shoulder discussed above, he sustained bruises and contusions to the right side of his body when the Thornton automobile collided with the Bullock car, but these have healed.

■ It is common knowledge that there is no precise formula for gauging whether a verdict is excessive and that each case must be decided upon its own particular facts.

*Goodman v. Missouri Pacific Railroad Company,* 312 S.W.2d 42, 49[8] (Mo.1958); *Zipp v. Gasen's Drug Stores, Inc.,* 449 S.W.2d 612, 622 (Mo.1970). Appellants cite a number of cases in support of their contention that this verdict is excessive; all but three are from the 1950 era or prior thereto. The latest case cited, *Shaffer v. Kansas City Transit, Inc.,* 463 S.W.2d 606 (Mo.App.1971), involved a judgment for a woman school teacher who sustained injuries to the deltoid muscle and ligaments leading into the humerus at the left shoulder with a resultant "green bone." An award of $15,000.00 was approved. Respondent cites cases which have upheld verdicts of $50,000.00 and above; but like those cited by appellants none are "white horse cases."

■ Appellants have failed to support their claims of "bias, passion and prejudice" with any evidence other than the size of the verdict. We therefore find no bias, passion and prejudice on the part of the jury.

■ Whether the jury's verdict was a result of mistake or honest error in judging the nature and extent of respondent's injuries has already been considered by the trial court and ruled adversely to appellants' contentions. An award for personal injuries should not, on appeal, be held excessive unless it would work a manifest injustice to let it stand. *Rickard v. Pratt,* 459 S.W.2d 13, 17[12] (Mo.App.1970).

■ We conclude that there is sufficient evidence in this record so that this verdict and judgment should not be held to be excessive and that permitting it to stand will not work a manifest injustice.

Pursuant to Rule 84.14, we reverse the judgment as to appellant Bullock and enter judgment in his behalf in this court. We affirm the judgment with respect to appellants Gary L. Thornton and R. J. Reynolds Tobacco Co.

SIMEONE, P. J., and GUNN, J., concur.